UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X   Case No.: 21-cv-06108
ROBERT UTNICKI and DAWN UTNICKI,

                              Plaintiffs,                            **COMPLAINT**

       -against-

SPARTAN AUTO GROUP LLC d/b/a
VICTORY MITSUBISHI and
JP MORGAN CHASE BANK, N.A. d/b/a
CHASE AUTO FINANCE,

                              Defendants.
------------------------------------------------------------------------X

Plaintiffs, by and through their attorneys, FAGENSON & PUGLISI, PLLC, upon knowledge as to themselves and their own acts, and as to all other matters upon information and belief, bring this complaint against above-named defendants and in support thereof allege the following:

INTRODUCTION

1. Notwithstanding the enforcement action of the Attorney General of the State of New York in 2017, in which the State of New York obtained a Court Order permanently enjoining defendant Victory Mitsubishi (or "dealership") from engaging in fraudulent, deceptive, and illegal sales tactics and other deceptive practices against consumers and directing Victory Mitsubishi to pay to defrauded consumers restitution, damages and civil penalties, Victory Mitsubishi boldly continues its same fraudulent and

1

illegal business practices by defrauding plaintiffs when they purchased a vehicle in November 2020 and other hapless members of the general public.

2. As shown by the Court Order obtained by the Attorney General of the State of New York, against Victory Mitsubishi and the many negative online reviews from defrauded customers, this fraudulent and deceptive course of conduct towards plaintiffs is not an isolated instance, but is ingrained in Victory Mitsubishi's business practices towards consumers at large.

3. By its misconduct, Victory Mitsubishi inflicts and is bound to inflict untold suffering and hardship on poor, vulnerable consumers such as plaintiffs, who often do not know what to do when something such as this happens to them. Defendants have caused plaintiffs harm and continue to date to cause plaintiffs harm. Having received no relief from defendants, plaintiffs bring this action to redress that harm.

4. Plaintiffs bring this action seeking, damages against defendants pursuant to the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, injunctive relief and damages against defendants pursuant to New York General Business Law ("NYGBL") §§ 349–350 for defendants' deceptive acts and practices and false advertising, damages against defendants for common-law fraud and relief against defendants pursuant to New York Motor Vehicle Retail Instalment Sales Act ("MVRISA")–New York Personal Property Law § 301 *et seq*.

## JURISDICTION AND VENUE

5. Plaintiffs re-allege paragraphs 1-4 as if fully re-stated herein.

6. This Court has federal jurisdiction pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367 as they arise out of the same set of transactions forming the basis of the federal claims.

7. This Court has venue pursuant to 28 U.S.C. § 1391(b) in that a substantial portion of the events or omissions giving rise to this action occurred in this District.

## PARTIES

8. Plaintiffs re-allege paragraphs 1-8 as if fully re-stated herein.

9. Plaintiffs are natural persons and are husband and wife.

10. At all relevant times, plaintiffs resided in Kings County, New York.

11. Upon information and belief, defendant Bank of America, N.A. is a foreign business corporation incorporated under the laws of the State of Delaware.

12. Upon information and belief, defendant JP Morgan Chase Bank, N.A. ("Chase") is a national banking association organized and existing under the laws of the United States.

13. As it transacts with plaintiff Dawn Utnicki (or "Mrs. Utnicki"), Chase does business as Chase Auto Finance.

14. Upon information and belief, Chase has a principal place of business in the County of New York, State of New York.

3

15. Defendant Spartan Auto Group LLC doing business as Victory Mitsubishi is a domestic limited liability company with a principal place of business in the County of Bronx, State of New York.

16. Victory Mitsubishi is a retail dealer in new and used automobiles.

17. Mrs. Utnicki entered into a consumer credit transaction with Victory Mitsubishi as contemplated by 15 U.S.C. § 1602(i), in that the money, property or services which were the subject of the transaction were primarily for personal, family or household purposes.

18. Victory Mitsubishi is a "creditor" within the meaning of 15 U.S.C. § 1602(g) and 12 C.F.R. § 226.2(a)(17) because at all relevant times Victory Mitsubishi, in the ordinary course of its business, regularly extended consumer credit which is payable in more than four installments or for which the payment of a finance charge is or may be required, and Victory Mitsubishi is the person to whom the debt arising from the consumer credit transaction was initially payable.

19. The consumer credit transaction out of which this action arose is a transaction pursuant to the Federal Trade Commission "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

20. Victory Mitsubishi assigned Mrs. Utnicki's retail installment contract (or "RIC") to Chase.

21. Chase is liable to Mrs. Utnicki for its own misconduct and, by virtue of the Holder Rules, is jointly and severally liable with Victory Mitsubishi to Mrs. Utnicki for the misconduct of Victory Mitsubishi herein.

## FACTUAL ALLEGATIONS

22. Plaintiffs re-allege paragraphs 1-21 as if fully re-stated herein.

23. On November 2, 2020, Victory Mitsubishi advertised for sale a used 2017 Chrysler 300 automobile.

24. In the advertisement, Victory Mitsubishi advertised the price of the Chrysler as $19,995.

25. No price other than $19,995 was displayed in the advertisement.

26. Plaintiffs were familiar with Victory Mitsubishi because in September 2019, plaintiffs had visited Victory Mitsubishi and plaintiff Robert Utnicki (or "Mr. Utnicki") had purchased from there a new 2019 Mitsubishi Outlander sports utility vehicle.

27. Mr. Utnicki purchased the Outlander with the help of a loan from Victory Mitsubishi, which took a security interest in the Outlander in the amount of the loan.

28. Upon Mr. Utnicki's purchase, Victory Mitsubishi immediately assigned the loan and security interest to Flagship Credit Acceptance LLC ("Flagship").

29. The monthly loan payment to Flagship for the Outlander was $542.83.

30. By November 2020, plaintiffs decided it was better to acquire a

5

smaller vehicle with a lower monthly payment.

31. Mr. Utnicki had been diligently making the loan payments on time each month for the Outlander for around a year.

32. He was eager to re-build his credit rating and made sure he was never late on a loan payment.

33. Mr. Utnicki's credit score had been as low as around 540 but by November 2020 he had slowly re-built it to around 570 due, in large part, to his on-time payments to Flagship.

34. By November 2020, the pay off balance on the Outlander loan was $21,326.

35. It was in an effort to acquire a smaller vehicle with a lower down payment that plaintiffs visited Victory Mitsubishi on November 2, 2020.

36. Plaintiffs' intention was for Mr. Utnicki to purchase a suitable vehicle and trade in the Outlander.

37. Because of her illness, Mrs. Utnicki does not drive, does not know how to drive, cannot drive, and does not possess a driver license.

38. Mr. Utnicki had always been the person in their household who bought the vehicles in his name and who drove the vehicles.

39. However, Mrs. Utnicki always accompanied Mr. Utnicki when a vehicle was being purchased, since her input is needed in the selection process.

40. When plaintiffs arrived at the dealership on November 2, 2020, they asked to speak with Joe.

41. After waiting in the waiting area, they were shown to Joe's office.

42. On November 2, 2020, Joseph ("Joe") Gerbino, Jr. was a finance manager at Victory Mitsubishi.

43. Joe Gerbino, Jr. is a finance manager at Victory Mitsubishi as of the date of the filing of this action.

44. Joe Gerbino, Jr. is an employee at Victory Mitsubishi as of the date of the filing of this action.

45. Plaintiffs were familiar with Joe, because he was the finance manager with whom they had dealt in 2019 when they purchased the Outlander.

46. Joe greeted plaintiffs and asked Mr. Utnicki if he was back with the Outlander.

47. Mr. Utnicki replied, "yes", they are looking to trade in the Outlander and buy a smaller and less expensive car.

48. Joe and a few men who appeared to be colleagues of his at the dealership went outside and inspected the Outlander and when he returned to plaintiffs he told them that the dealership would give them a trade-in value of $19,500 for the Outlander.

49. Plaintiffs were satisfied with that value and calculated that they would only need to roll the remaining balance on the Outlander loan of around $1,800 into the new loan for whichever new car they would settle upon.

50. Mr. Utnicki asked Joe whether he would owe any money to Flagship once the roll-over was complete, and Joe said, "no".

51. Joe told Mr. Utnicki the dealership would pay off the Flagship loan and roll over to the new loan the balance of approximately $1,800.

52. Mr. Utnicki asked Joe whether he would owe anything to Flagship.

53. Joe responded, "no, you will owe Flagship nothing".

54. Upon hearing that from Joe, Mr. Utnicki told Joe to proceed with their purchase of the Chrysler.

55. Joe did a credit check for the loan for Mr. Utnicki.

56. Joe then told Mr. Utnicki that his credit rating was too low for him to get a car loan at a monthly payment much lower than the-then current $542 Outlander payment, and that in fact the lowest monthly payment he was seeing for Mr. Utnicki was $590.

57. Plaintiffs were about to leave Joe's office and continue their search for a more affordable car elsewhere because $590 monthly loan payment was even more than the Outlander loan and was simply too much, when Joe stopped them and asked what Mrs. Utnicki's credit score was like.

58. Plaintiffs told Joe that Mrs. Utnicki did not drive and cannot drive and did not even have a driver license, because she has suffered from epilepsy her entire life.

59. Plaintiffs further told Joe that Mrs. Utnicki did not work and had never worked, that her only income was from SSI due to her illness and that she had been on SSI for almost all her life.

60. Plaintiffs also told Joe that Mrs. Utnicki's income from SSI was

around only $860 per month so they doubted that she would qualify for a car loan.

61. Joe told plaintiffs not to worry about SSI, just to allow him to pull her credit to see her credit score.

62. Joe asked for and Mrs. Utnicki gave him orally her name, date of birth, address and social security number.

63. Joe did not give to Mrs. Utnicki, and she did not sign, any credit application on paper.

64. **Joe seemed to plaintiffs to put this information into the computer on his desk.**

65. Presumably due to the coronavirus pandemic, there was a plexiglass barrier installed on Joe's desk separating Joe and his computer from plaintiffs who were seated opposite Joe at the desk.

66. The computer monitor even partially obstructed plaintiffs' view of Joe's face through the plexiglass barrier.

67. There was a slot cut out of the plexiglass, similar to the one set up for a bank teller.

68. The screen of the computer was turned to Joe and plaintiffs could not see anything on the screen.

69. After Joe typed into his computer, he told plaintiffs that Mrs. Utnicki's credit score was 740.

70. Joe told plaintiffs that this score was high enough for them to obtain financing for a car but that the loan would have to be in Mrs. Utnicki's name.

71. As mentioned, Mrs. Utnicki had never purchased a car before, did not have a driver license, and had only $860 in monthly SSI income, so plaintiffs were skeptical that she would be able to purchase a car and get a car loan.

72. However, Joe assured plaintiffs that Mrs. Unicki had qualified for a loan.

73. Joe then told Mrs. Utnicki she had to sign certain documents.

74. Joe slipped the papers to Mrs. Utnicki through the slot in the plexiglass and indicated to her the portions he had highlighted in yellow, telling her that that is where she needed to sign.

75. Joe told Mrs. Utnicki repeatedly, "sign here", "sign here", "sign here" and told her to hurry.

76. Joe kept one hand on the top of the pages at all times, while indicating to Mrs. Utnicki where he wanted her to sign.

77. Joe did not tell Mrs. Utnicki, or Mr. Utnicki, what the documents were that Mrs. Utnicki was signing and did not tell her what the documents said.

78. Joe did not allow Mrs. Utnicki to read the documents she was signing.

79. Joe asked Mrs. Utnicki to return each paper she signed immediately after she signed it, and Mrs. Utnicki did so.

80. Concerning the loan, Joe told plaintiffs only that the monthly payment would be $420.

81. Joe did not tell plaintiffs the amount of their loan.

82. Joe did not tell plaintiffs the length of their loan.

83. Joe did not even discuss with plaintiffs what vehicle it was that the loan was based on.

84. As $420 was a significantly lower monthly payment than the nearly $543 which Mr. Utnicki was then paying for the Outlander, plaintiffs agreed to proceed with the loan.

85. Joe did not give Mrs. Utnicki or Mr. Utnicki a copy of any of the documents which Mrs. Utnicki signed.

86. In fact, when plaintiffs left the dealership later that day, no-one at the dealership had given to either of them any document regarding the Chrysler purchase, whether signed by Mrs. Utnicki or not.

87. Joe told plaintiffs that he would need for them to pay a $500 down payment. but due to not him not knowing what vehicle Joe had in mind, Mr. Utnicki did not give Joe the $500 down payment.

88. However, due to him not knowing what vehicle Joe had in mind, Mr. Utnicki did not immediately give Joe the $500 down payment.

89. Joe then told another employee at the dealership to "show them the red Chrysler".

90. Joe told plaintiffs that they should go outside and look at a Chrysler 300 car to see if they liked it.

91. This was the same Chrysler which Victory Mitsubishi advertised for sale on the internet for a price of $19,995.

92. Plaintiffs then left Joe's office and went outside to the lot of the dealership to inspect the Chrysler.

93. There was a window sticker displayed on the Chrysler.

94. This window sticker was a Buyers Guide.

95. There was no price displayed on the Buyers Guide or anywhere else on the Chrysler.

96. There was no price displayed near the Chrysler for the Chrysler.

97. After inspecting the Chrysler, plaintiffs decided they would like to buy it, if possible.

98. Plaintiffs then returned to Joe in his office and told him they would like to buy the Chrysler.

99. Plaintiffs asked Joe for the price and he said "$19,000 and change".

100. Joe then told plaintiffs that defendant Chase was the bank that would finance Mrs. Utnicki's purchase.

101. To make doubly sure he would not owe any more money to Flagship after November 2, 2020, Mr. Utnicki again asked Joe if in trading in the Outlander he would be released from owing any money to Flagship.

102. Joe told Mr. Utnicki, "yes, you will owe Flagship nothing. You are financing with Chase Bank now".

103. Mr. Utnicki then gave Joe the $500 down payment for the Chrysler.

104. Thereafter, a salesman named Jason Lewis entered Joe's office.

105. Jason Lewis was a salesman at Victory Mitsubishi on November 2,

2020.

106. Jason Lewis is a salesman at Victory Mitsubishi as of the date of the filing of this action.

107. Jason Lewis is an employee at Victory Mitsubishi as of the date of filing of this action.

108. Upon entering Joe's office on November 2, 2020, Jason told plaintiffs that he had just spoken with his manager; that there was a problem and that Flagship would not "take back" the Outlander.

109. Suddenly worried, Mr. Utnicki asked what that meant and whether he would still owe Flagship any money.

110. Jason asked plaintiffs to accompany him to a cubicle outside of Joe's office and there he assured Mr. Utnicki he no longer owes Flagship any money.

111. Mr. Utnicki asked Jason if he was sure that he will owe nothing and Jason responded, "don't worry, you won't. I will take care of this. I will call the bank and work it out."

112. Assured by Jason, plaintiffs thereafter left Joe's office.

113. Jason removed the license plates from the Outlander and handed them to Mr. Utnicki.

114. Jason told Mr. Utnicki that he should surrender the plates to the New York State Department of Motor Vehicles ("DMV").

115. Mr. Utnicki asked Jason why he could not simply transfer the plates to the Chrysler, instead of having Mr. Utnicki surrender the plates to the DMV.

116. Jason said, "no", the plates could not be placed on the Chrysler, they had to be surrendered to the DMV.

117. On November 2, 2020, plaintiffs drove from the dealership in the Chrysler and left the Outlander, without plates, at the dealership.

118. As instructed by Victory Mitsubishi, the following day November 3, 2020, Mr. Utnicki surrendered the Outlander license plates to the DMV.

119. Plaintiffs then realized that neither Joe nor anyone else at the dealership had given them copies of any of the papers Mrs. Utnicki had signed or any document concerning their car purchase at all.

120. Mr. Utnicki telephoned the dealership and asked for a copy of all of the paperwork concerning the purchase.

121. Mr. Utnicki was told to return to the dealership for copies.

122. On or about November 5, 2020 Mr. Utnicki telephoned Flagship for confirmation that he did not owe Flagship any money.

123. The Flagship representative told him that he still owed on the loan.

124. Mr. Utnicki explained to the Flagship representative that he had traded in the Outlander just a few days earlier and that Victory Mitsubishi was supposed to have paid off the Flagship loan.

125. Mr. Utnicki told the Flagship representative that employees at Victory Mitsubishi assured him that they had telephoned Flagship and that Flagship agreed that upon the purchase of the Chrysler he no longer owed any money to Flagship.

126. The Flagship representative told Mr. Utnicki that she saw no evidence of any telephone call from anyone at Victory Mitsubishi and that, in any event, he still owed the loan and there was no record of any full satisfaction of the loan.

127. Mr. Utnicki was bewildered and confused, knowing that both Joe and Jason told him repeatedly on November 2, 2020 before the purchase of the Chrysler and after, that he would owe Flagship no money going forward.

128. Mr. Utnicki telephoned Flagship later the same morning and inquired again, but was told the same thing by the second representative as was told to him by the first: he still owed the Flagship loan.

129. Realizing that he was still on the hook for the Flagship loan, while his wife had just taken out a second loan on a different vehicle, Mr. Utnicki became greatly distressed and upset, as did Mrs, Utnicki.

130. Not only did they still have the $543 monthly payment loan, but they now had a $420 monthly payment loan.

131. Thereafter, plaintiffs discovered that Joe had added to their purchase without their knowledge a Tire and Wheel warranty for a price of $1,500

132. Plaintiffs also discovered that Joe had sold them the Chrysler a price of $20,995 and not the advertised $19,995.

## AS AND FOR A FIRST CAUSE OF ACTION

## TILA - 15 U.S.C. § 1638(b)

### (Failure To Provide TILA Disclosures Prior To Consummation)

133. Plaintiffs re-allege paragraphs 1-132 as if fully re-stated herein

134. Plaintiffs first saw or received a copy of the required TILA on or about November 5, 2020, as alleged.

135. On or about November 5, 2020 was when the dealership gave Mrs. Utnicki a copy of the TILA disclosures.

136. Mrs. Utnicki did not receive a copy of the required TILA disclosures in a form she could keep, or at all, prior to the consummation of the transaction on November 2, 2020.

137. Joe, Victory Mitsubishi's finance manager, failed to provide Mrs. Utnicki with a copy of the required TILA Disclosures in a form she could keep, or at all, prior to the consummation of the transaction, in violation of 15 U.S.C. § 1638(b) and Regulation Z, 12 C.F.R. § 226.17(b).

138. No-one at Victory Mitsubishi provided Jean-Baptiste with a copy of the required TILA Disclosures in a form she could keep, or at all, prior to the consummation of the transaction, in violation of 15 U.S.C. § 1638(b) and Regulation Z, 12 C.F.R. § 226.17(b).

139. Chase is liable to Mrs. Utnicki pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

140. Defendants are jointly and severally liable to Mrs. Utnicki in the amount of twice the finance charge, and for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640.

## DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury on all issues so triable.

Dated: New York, New York
      November 2, 2021.

          */s/ Novlette R. Kidd*
          NOVLETTE R. KIDD, ESQ. (NK 9339)
          FAGENSON & PUGLISI, PLLC
          Attorneys for Plaintiff
          450 Seventh Avenue, Suite 704
          New York, New York 10123
          Tel.: (212) 268-2128
          Nkidd@fagensonpuglisi.com